ARBITRATOR'S OPINION AND AWARD

In the Matter of Arbitration Between:

August 20, 2016

SOUTHWEST AIRLINES COMPANY

and

TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO
Local 555

Grievance: ALL-5001/15 (Covered Work–Time Frames)

Before

Elizabeth Neumeier, Arbitrator

Representing:

The Company:     Thomas E. Reinert, Jr., Morgan, Lewis & Bockius LLP

The Union:       Cortney Heywood, Arbitration Consultant, TWU, Local 555

Statement of the Award:    The grievance is dismissed as untimely filed. In accordance with
Article Twenty, Section One, Paragraph C, the costs of the
arbitration shall be borne by the Union.

EXHIBIT 2

## BACKGROUND

Southwest Airlines Company (Company or Southwest) and the Transport Workers Union Local 555 (Union) are parties to a collective bargaining agreement (CBA) effective July 1, 2008 through June 30, 2011, and continuing through times relevant to this case. On November 16, 2015, the Union filed a grievance stating:

> The Company is in violation of the current CBA between Transport Workers Union (TWU) and Southwest Airlines (SWA) by allowing contractors or other non-covered employees to perform functions that are clearly outlined as job duties of a Ramp Agents, TWU members. These contractors are clearly outside the Scope of the Agreement. The Union notified SWA on October 29, 2015, effectively drawing a line in the sand that the Union intended to file a Group Grievance over the matter. The Union gave a deadline of November 15, 2015 as the date of honoring the clear and unambiguous language of the CBA. There have been no discussions between the parties regarding the return of the A/C cleaning work to our employees.

> Remedy or Settlement Sought:

> The Union seeks to have the Company cease and desist the practice of contracting out the A/C cleaning job duties under Article 5 of the current CBA, and return the jobs to the appropriate members of TWU 555. Due to the lack of dialogue or discussion since the date notice is given in the notification letter, the Union is seeking an OT bypass for all impacted agents that were denied the opportunity to work the hours necessary for the cleaning of the A/C, from the filing date of this grievance. All impacted agents to be paid at the applicable OT rate, MOT or VOT. The Union is also seeking to have any agents currently displaced by Reduction in Force measures, of Article 15 §1, offered a chance to return to their homes station to replace the Company's contract cleaners. [JX 2, pg. 9.]

The referenced October 29-letter from Jerry McCrummen, Vice Presidents, TWU Local 555, states:

> The Union is hereby giving notice that the Company is in violation of Article 5, Section One, Paragraphs H, I and J of that article:

> *H. Equips aircraft cabin interiors for flights with*

> *equipment and supplies such as blankets, literature,*
> *disposal and refuse containers, and commissary items*
> *(including ice), in accordance with applicable paperwork.*
> *I. Hand cleans interior of aircraft by such operations as*
> *hand sweeping and dusting, empties ash trays, and uses*
> *specialized cleaning fluids and materials, using*
> *mechanized cleaning aids as required, in accordance with*
> *applicable paperwork.*
>
> *J. Removes stains from upholstery; cleans windows; and*
> *cleans and services laboratories and galleys and disposal*
> *containers, in accordance with applicable paperwork.*

> The aircraft cleaning has been contracted out to various
> service companies around the system which in clear violation of
> the clear and unambiguous language of the CBA. This work is
> covered work for the SWA Ramp Agents and members of TWU
> Local 555. Realizing that this practice has gone on for a
> considerable time, the Union is giving SWA until November 15,
> 2015 to cease and desist the practice of allowing our work to be
> contracted out. This "line in the sand" should give the Company
> ample time to handle the staffing and training to return this work to
> our membership. The Union is willing to meet with the Company
> to discuss specific cities where the November 15, 2015 date is not
> possible to set implementation dates for those select cities. If the
> practice has not stopped by that time, the Union will file a Group
> Grievance. [JX 2, pg. 10. Emphasis original.]

On December 2, 2015, Michelle Jordan, Director Labor Relations, responded on behalf
of the Company as follows:

> I am in receipt of your Group Grievance TWU-ALL-5001/15 (A/C
> Cleaning) dated November 13, 2015. In your grievance, you claim
> the Company is in violation of Article 5 of the current Agreement
> because it is using contractors or other non-covered employees to
> perform aircraft cleaning. Article 5 refers to work "historically
> performed" by covered employees. You contend the duties to clean
> aircraft are "clearly the job duties of the TWU members."
>
> As you are profoundly aware, the Company has a long-standing
> practice of using Provisioning Agents (TWU 555 members),
> Appearance Technicians (represented by AMFA), Flight
> Attendants (represented by TWU 556), third-party vendors, and
> others to perform aircraft cleaning. Contrary to the allegations in
> your Grievance, aircraft cleaning is not the exclusive work of the

TWU 555 but is a shared duty among multiple workgroups.
Aircraft cleaning has never been "historically performed"
exclusively by your members. In fact, the Appearance technicians'
Collective Bargaining Agreement contains a specific job
classification which includes "cleaning, washing, and polishing the
interior of airplanes." This language was originally negotiated for
the job classification "Cleaners" in the 1973 Collective Bargaining
Agreement between Southwest Airlines and the International
Association of Machinists and Aerospace Workers, and the same
language remains intact today.

This is not the first time TWU 555 has filed a grievance on this
very topic. In 2012, the Company received two grievances from
the Union claiming the use of a third-party vendor for aircraft
cleaning in MHT was a violation of the Agreement. Ultimately, the
TWU withdrew the grievances, and the Company continues to use
third parties to clean aircraft in MHT and elsewhere. Again, as
recent as August of this year, TWU 555 filed a group grievance
claiming the use of non-covered employees outside the Scope of
the Agreement were performing functions that are the job duties of
the TWU 555 members. Once again, the TWU ultimately
withdrew the grievance.

Your grievance is also not timely. As you know, the grievance
timeframe provisions are specifically outlined in Article Twenty of
the Agreement. The Company has consistently enforced provisions
by requiring a grievance be timely filed when the alleged violation
of the Agreement is known or should have been known by the
Union simply put, if the Union believed the Company with
violating the Agreement by allowing someone other than a TWU
555 member to clean its aircraft, it should have been filed decades
ago.

Based on the above and for other reasons, I find no contractual
violation. This grievance is respectfully denied. [JX 2, pgs. 7-8.]

After the System Board deadlocked over the time frames issue on December 16, 2015,
the Union appealed the case to arbitration. The parties agree that the instant case is properly
before the undersigned arbitrator for a decision on the following stipulated issue:

Is Grievance TWU-ALL-5001/15 timely filed under the
agreement?

ALL-5001/15 (Covered Work--Time Frames)                                         5

The Company offered testimony from Director of Aircraft Appearance Mike Hunter, Senior Director of Ground Operations Planning and Standards Anne Naylor, now-retired Secretary to the Vice President – Ground Ops Ruth Ann Chancellor, and Senior Manager of Labor Relations for Ground Operations and Provisioning Dan Kusek.

The Union did not offer any testimony or exhibits at the arbitration hearing, and rested on the contention that the Company, as the moving party, had not met its burden of proof.

Company witness Hunter has worked for Southwest Airlines for 27 years in a variety of ground operations positions and locations, and eight years in maintenance. Hunter testified that he is familiar with remain overnight (RON) cabin cleaning, which is the cleaning of the aircraft after the daily operations. He performed that work as a ramp agent in Lubbock in 1979. Hunter explained that the Aircraft Appearance Department, part of Technical Operations, "owns" all RON cleaning. He works with the field service group, and they oversee all the vendors for aircraft cleaning in the 90+ locations, other than maintenance bases. Currently, in two locations, Dallas and Chicago, a limited amount of RON cleaning, an average of three to five airplanes per night, is done by Southwest's appearance technicians, with the other aircraft being cleaned by vendors. Those employees work at maintenance bases, are represented by AMFA and have their own collective bargaining agreement. Previously, the appearance technicians also performed this work in Houston and Phoenix, but under Letter of Agreement No. 1, signed on July 11, 2012, the Company was allowed to attrition out the RON cleaning and turn that work over to a vendor. (CX 1.) Hunter testified that since at least 2005, and probably much earlier, none of the RON cleaning has been done by TWU 555-represented ramp employees at any location. When he went to San Francisco in 1982 the work was being done by a vendor. He said that ramp employees were aware of contract cleaners coming into their stations to clean airplanes. On cross examination, he said that he participated in the negotiation of Company Exhibit 1 and the Company negotiated with AMFA to attrition that work.

Company witness Naylor has worked in the industry for 30 years in a variety of positions and started with Southwest Airlines in Dallas as a ramp agent in 1992. At that time she did no RON cleaning. From 1994 through 1995 Naylor was an instructor for ramp new hires and no instruction was provided on how to clean and aircraft. At the end of 2007, Naylor was the senior director of training and standards, and participated in developing and reviewing RFIs and RFPs to consolidate multiple contract cleaners for RON aircraft. She said that, at the end of the process in 2008, five or six contract companies were chosen to provide the RON cleaning.

Company witness Chancellor retired from her position as Senior Director of employee resources in ground operations in 2010, after a career in many positions starting as a secretary in ground operations in 1978. She became involved with contract administration in 1979 and contract negotiations in 1995. Chancellor reviewed the following series of collective bargaining agreements covering ramp employees:

- 1976-1979 agreement between the Company and the IAM. (CX 2.)
- 1979-1982 agreement between the Company and the IAM (CX 3.)
- 1981-1984 agreement between the Company and the IAM (CX 4.)

ALL-5001/15 (Covered Work–Time Frames)                                                          6

- 1984-1989 agreement between the Company and the IAM (CX 5.)
- 1990-1994 agreement between the Company and ROPA (CX 6.)
- 1995-1999 agreement between the Company and ROPA (CX 7.)
- 2001-2006 agreement between the Company and TWU Local 555 (CX 8.)

As reflected on the execution page, Chancellor was a representative for the Company and ROPA was represented by Jesse Soto, Jerry McCrummen and Vince Alvarado during negotiations for the 1995-1999 agreement. Chancellor testified that she also represented the Company during negotiations for the 2001-2006 agreement and that the Union was represented throughout bargaining for that agreement by Garry Drummond, Mike Aron, Richard Heron, and Mike Roach.

Comparing the language in Article Five, Section One, paragraphs H, I and J of the current CBA with the language in the predecessor contracts, Chancellor said that the language has been essentially the same since 1976 and was originally negotiated by the IAM. She said that the language with respect to third-party contracting, currently contained in Article Two, Paragraph F, entered the agreement in the 1995-1999 CBA with ROPA. Chancellor said that she was involved in the negotiations and the Company primarily wanted to address the growth in freight facilities and growth in the Company. When the Company went into a new location they did not have proper facilities for all employee groups. In the past ramp work was contracted out because there were not facilities to house ramp employees, such as occurred in San Francisco. The number of ramp positions was growing during that period of time and the issue included ensuring the Union got the growth in those positions. Chancellor said that there was no discussion of aircraft cleaning and she could not recall any negotiations in which the Union raised any concern about contracting of RON cleaning.

Company witness Chancellor also testified that in the grievance process any grievance that is awarded or settled prior to system board is non precedent setting, unless the Company and the Union agreed to make it so, in writing. Beginning at the system board level, any decision is precedent-setting, per language in the contract, and it has been that way for a while.

Company witness Kusek testified that the Company raised the time frames issue in its first response to this grievance and at system board. He said that the Union had filed essentially the same grievance on August 3, 2015, the Company raised time frames and the Union withdrew that grievance on August 21, 2015. (CX 9.) On September 14, 2012, a provisioning agent in Manchester filed a grievance protesting "Cleaners are performing covered work, emptying trash and ice, that are provisioning duties for terminators." The grievance was withdrawn after a system board was requested and before it was held. (CX 10, pgs. 8-12.) A similar grievance, also protesting vendor cleaners, was filed on September 12, 2012, and that grievance was withdrawn after the system board deadlocked. (CX 10, pgs. 1-7.) Those two grievances did not concern cleaning the RON aircraft cabins. The disputed work was emptying trash and ice, normally work the provisioning agents would do. Kusek testified that once a decision is made at the system board level, whether to withdraw, proceed forward, or arbitrate, it sets precedent.

Company witness Kusek also reviewed four arbitration decisions upholding the

Company's time frames objections. In the Cicero case in 1987, Arbitrator Sisk strictly enforced time limits for filing a grievance. (CX 11.) In the Smith case in 2002, Arbitrator Kelly dismissed the grievance because a system board had not been requested within the 30-day time limit. (CX 12.) In the Alexander/Pratt case in 2014, Arbitrator Vernon dismissed two grievances as being untimely because they could have and should have become aware of facts giving rise to the grievance and no circumstances beyond their reasonable control prevented them from doing so. (CX 13.) In a Scope Violation case under the dispatchers CBA, on January 9, 2016, Arbitrator Toedt dismissed a grievance from TWU Local 550, finding that it was filed after the 10-day deadline. (CX 14.) Kusek testified that the instant grievance is not timely because the Union knew this was happening. If anyone had thought it was exclusively covered work, someone at the Union should have raised it decades ago. In his nearly 27 years' involvement in ramp issues, the headcount of ramp employees has gone up steadily as the Company has grown, added flights, added locations and added staffing. No ramp employees are on furlough. On cross examination, he acknowledged that vendors are still cleaning aircraft. He agreed that it is a negotiated duty for ramp agents to clean aircraft if they are required to do so.

## RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

### ARTICLE TWO
### SCOPE OF AGREEMENT

A.      **Recognition.** The Union is recognized by the Company as the sole and exclusive bargaining agent for the Employees of the Company based in the United States, its territories and possessions, who comprise the class and craft of Ramp, Operations, Provisioning, and Freight Agents. The Union reserves the right to defend and protect any covered Employee.

                              *      *      *

F. **Third Party Contracting**. The Company and the Union agree that job security and a stable work environment are important objectives to be maintained. Therefore, the Company agrees that contracting with third parties shall be prohibited if it results in a reduction in force or involuntary furlough. It is the intent of both parties that covered work be done by Southwest Airlines Employees.

        1.      Should the Company have a need to contract with third parties for the performance of covered work, the Company shall notify the Union of:

                a.      The nature of the contract; and
                b.      The anticipated length of time the third

ALL-5001/15 (Covered Work--Time Frames)                                          8

party work shall be required.

The Company and the Union agreed to discuss the
time frames in an attempt to minimize such third
party work and return same to covered Employees.
No such contracting shall occur when and if
adequate facilities are available for the Company's
operations, ramp, and/or freight needs.

2.   Should the Company have a need to contract with
     third parties for the performance of covered work at
     stations where flight activity does not exceed 12
     departures per day, the Company shall be entitled to
     do so. The Company shall notify the Union of:

     a.   The nature of the contract; and
     b.   The anticipated length of time the third
          party work shall be required.

     This provision shall not apply to stations in
     operation as of the date of ratification (March 27,
     2009).

## ARTICLE FIVE
## CLASSIFICATIONS

### SECTION ONE
### RAMP AGENT/PROVISIONING AGENT

The work of Ramp, and Provisioning Agents includes the
functions which have been historically performed by such agents
at Southwest Airlines stations and includes, but is not limited to,
any or all of the following work covered under this specific labor
contract.  Agents required to perform such duties must be current
and qualified within that classification.

*   *   *

H. Equips aircraft cabin interiors for flights with equipment and
supplies such as blankets, literature, disposal and refuse containers,
and commissary items (including ice), in accordance with
applicable paperwork.

I. Hand cleans interior of aircraft by such operations as hand

sweeping and dusting, empties ash trays, and uses specialized cleaning fluids and materials, using mechanized cleaning aids as required, in accordance with applicable paperwork.

J. Removes stains from upholstery; cleans windows; and cleans and services laboratories and galleys and disposal containers, in accordance with applicable paperwork.

## ARTICLE TWENTY
## GRIEVANCE/SYSTEM BOARD/ARBITRATION
## DISCHARGE and DISCIPLINE

### SECTION ONE
### PROCEDURES

*   *   *

E. **Time Frames.** For the purpose of this Article, a working day shall be defined as Monday through Friday, excluding all Company recognized holidays. It is expressly understood and agreed that, if any of the time frames set forth in this Article are violated by the Company, the Employee shall be awarded the desired settlement without precedent. Furthermore, if the time frames set forth are violated by the Union the grievance shall be considered withdrawn. Determination of time frame violation issues shall take precedence over consideration of any other issue, and, if upheld, no further determination shall be appropriate.

F. **Extension of Time Frames.** It is understood and agreed that, at any step of the factfinding or grievance procedure, the time limits set forth may be extended by mutual agreement between the Company and the Union, in writing. Further, in the event either party, due to circumstances beyond the reasonable control of such party, does not become aware of, or is prevented from disclosing, facts or circumstances which would give rise to either a factfinding or a grievance, the time frame for pursuing such factfinding and/or grievance shall be extended as appropriate. If an Employee makes himself unavailable (other than on his regularly scheduled days off) to work his full shift on his last scheduled workday within the time frames under the fact finding procedures and paragraph H of this article, the Company may issue the notice/letter to the Employee upon his first full day returned to work.

*   *   *

L. **Interpretation/Application of Agreement.** In the event of a grievance arising over the interpretation of, or application of, this Agreement, or in the event of disciplinary action other than discharge, the following steps shall apply. However, if the action involves discharge or a Union grievance concerning a change in Work Rules, it shall proceed to sub- paragraph 3, below. Decisions made pursuant to Steps 1 through 3, below, shall not constitute precedent of any kind unless agreed to, in writing, by the Union and the Company.

1. **Step 1/Department/Assistant Manager ("Manager").** If an Employee is unable to resolve his grievance through his supervisor, within ten (10) calendar days of the occurrence of the circumstances in question, the grievance shall be summarized in writing and presented to the manager or his designee. At any meeting to discuss same, the Employee may be accompanied by his local representative. The manager or his designee shall issue a written decision upholding or denying the grievance within five (5) working days.

*   *   *

14. **Arbitration/Function and Jurisdiction.** The functions and jurisdiction of the Arbitrator shall be as fixed and limited by this Agreement. He shall have no power to change, add to, or delete its terms. He shall have jurisdiction only to determine issues involving the interpretation or application of this Agreement, and any matter coming before the Arbitrator which is not within his jurisdiction shall be returned to the parties without decision or recommendation. In the event any disciplinary action taken by the Company is made the subject of proceedings, the Arbitrator's authority shall, in addition to the limitations set forth herein, be limited to the determination of the question of whether the Employee(s) involved were disciplined for just cause. If the Arbitrator finds that the penalty assessed by the Company was arbitrary or unreasonable, he may modify or remove that penalty.

## CONTENTIONS OF THE PARTIES

The Company's Contentions

The Company contends that the action challenged by the grievance, and the reference point for the timeliness of the grievance, is the subcontracting of RON aircraft cabin cleaning.

The subcontracting of work by the Company is an action, not a passive "allowing contractors~ to perform… Job duties of a Ramp Agent[s]" as stated in the grievance. Subcontracting is the result of Company analysis, bidding and formal awarding of contracts, and the assignment of work to contract employees, as described by senior director, ground operations Naylor.

The Company notes that the grievance solely cites Article Five–Classifications for its allegation that the CBA has been violated by contracting out ramp agent work. However, subcontracting is actually controlled by Article Two, Section F–Third Party Contracting. That provision focuses on the Company's decision to subcontract work, including the need for subcontracting, whether it will result in reduction in force, and the duration.

The Company contends that the "circumstances in question" giving rise to a grievance over interpretation or application of the CBA are the actual contracting out of the work previously performed by ramp agents. The appropriate initiation of the 10-calendar day period was when the Company first contracted out aircraft cleaning that had been performed by ramp agents, sometime in the 1980s, or, at the latest, when the work was completely contracted out all RON aircraft cabin cleaning before 2000. Under either reference point, the time for a timely grievance is long past.

The Company contends that testimony from the three long-term Southwest managers establish that RON cabin cleaning was never exclusively the work of ramp agents. That work had been performed by appearance technicians represented by AMFA at four maintenance bases, and by vendors. Further, the language regarding third-party contracting did not enter the CBA until the 1995 ROPA agreement, with no mention at the table of RON aircraft cabin cleaning. Thus, the evidence established that the disputed work began to be contracted out at stations in the 1980s, was completely subcontracted at all stations by 2000, and was consolidated with 5-6 vendors in 2008. During that time grievances were filed and no discussions of the issue were raised by TWU Local 555 or its predecessor unions. The Union knew of the third-party contracting, as demonstrated by the two, 2012 grievances filed in Manchester. Further, in his opening statement District VI Representative Carney stated "without a doubt, the Union knew during that time that there was a violation and chose not to do anything."

The Company contends that grievance time limits have been taken seriously and applied strictly, as seen by prior arbitration awards. In this case, the Union made no effort to present extenuating circumstances for not filing a grievance challenging the subcontracting and the practice that began years ago. The Union's "continuing violation" theory is flawed. Article Twenty, Section One, Paragraph F expressly limits grounds for arguing for an extension of time. Rather than providing an evidentiary basis for its more than a decade long delay, the Union cannot simply assert a "continuing violation."

The Company contends that the Union's reliance on Article Five is also misplaced. While ramp agents may be "required to perform such duties," nowhere does the language say that any of the specified duties are the exclusive work of the craft or class. Here, the uncontested evidence shows that RON aircraft cabin cleaning has also been performed by appearance technicians. Further, the record establishes that Southwest contracted aircraft cleaning work at

many stations before 1995, when the subcontracting language was agreed to.

Finally, the Company contends that the grievance, if found timely, would be barred by the clearly-established past practice of subcontracting. Thus, proceeding to the merits would be futile and a waste of the parties' arbitration resources.

For the above reasons, the Company requests that Grievance No. TWU-ALL-5001/15 be dismissed on grounds of untimeliness.

## The Union's Contentions

The Union contends that the violation, by its nature, is continuing. Article Two, Paragraph F-1 requires the Company to notify the union if it wishes to contract with the third-party and reveal the desired length of the contract. The Company did not demonstrate that they had given specific notice to the Union of their wish to contract out RON aircraft cleaning, despite having done so since 1982. Company witnesses could not specify the moment when the attrition was completed and, therefore, the Union cannot be held to one singular event.

The Union notes that it recognized a contractual violation, expressed to the Company its intent to return to the contractual language, and grieved events following that date. Following the analysis of time limits and continuing violations described by Arbitrator Richard I. Bloch, the Union contends that the Company commits a "new act" each time it allows a person out of the work group to conduct a job function that has been negotiated for the members of TWU 555. This is a violation that happens every day, and every station across the system. It should not matter that the Company claims to have had these contracts with vendors for any number of years. Each act is in violation of the negotiated language, on a daily basis, and, as a result, the ability to file a grievance renews itself. The Union is not requesting back pay on every violation has occurred, but only over the ones since the Company was served with this grievance.

The Union contends that the Company is aware of proper negotiating procedures when attempting to attrition out work of a craft group. It did so in its current agreement with AMFA.

The Union contends that the Company is required to inform the Union of its intent to contract out work. The Company was found to have violated that requirement in 2011. (MCO-R-0885-11, Arbitrator Marvin Hill, December 9, 2011) The Union is not attempting to secure new work, but is protecting work that has been negotiated. The Company admitted that ramp agents previously performed these duties and that the Company never advised the Union of any past practices that govern the contractual language. The "zipper clause" contained in Article Three, Paragraph A requires that the agreed-to language be adhered to regardless of past agreements with TWU 555, any vendor, or any other bargaining group.

For the foregoing reasons, the Union requests that the grievance be found to have been filed in a timely manner so that the parties may proceed to the merits of the case.

## FINDINGS

The Union does not rely upon the extension of time frames provisions contained in Article Twenty, Section One, Paragraph F. That is, the Union does not claim that it did not become aware of facts and circumstances which would give rise to this grievance due to circumstances beyond its reasonable control. In fact, the Union acknowledges that it has been, for an extended period of time, fully aware that vendors and others were performing RON aircraft cleaning at bases throughout the system.

Clearly, the instant grievance was not filed within ten (10) calendar days of either the occurrence of vendors performing such work or the Company failing to give the Union notice of contracts with third parties, pursuant to Article Two, Paragraph F.

The analysis of the instant dispute thus turns on the applicability of the "continuing violation" concept put forth by the Union. Arbitrator Bloch distinguishes between "the act, which is grievable, and its effects, which are not." The Union's assertion that "the act" is each performance of RON aircraft cleaning and each letting or renewal of a contract for the performance of that work and just k by a vendor is not supported on this record.

First, the unrebutted evidence establishes that the language setting forth the "functions which have been historically performed" by ramp and provisioning agents first appeared in the CBA negotiated by the IAM in 1976. Despite the Union's assertion that Article Five, Section One makes RON aircraft cleaning covered work exclusive to the ramp agents, no evidence was offered to show that they, rather than vendors or appearance technicians, historically had performed that work as of 1976.

Further, it was not until the ROPA-negotiated 1995-1999 CBA that this bargaining unit was governed by any language dealing with third-party contracting. In the interim, RON aircraft cleaning had been performed by ramp agents, vendors, and, notably, appearance technicians represented by AMFA and under their CBA. There is no evidence that the Union, by filing a grievance or other protest, asserted that the Company's continuing to assign RON aircraft cleaning outside the bargaining unit violated the new, third-party contracting provisions.

More recently, in 2012, the Company negotiated an agreement to attrition the work that had been performed by appearance technicians. It has also consolidated its contracts with third-party vendors. Rather than constituting "new acts" these changes reflect the "continuing impact of the initial management decision" regarding how the RON aircraft cleaning would be performed. (96 Mich.L.Rev. 2384, 2394, Bloch 1998.) Throughout the years management has been steadfast in following that decision to have RON aircraft cleaning done by vendors, and not by ramp agents represented by TWU Local 555.

The Union has not asserted that, within the ten (10) days prior to the filing of the instant grievance, a reduction in force or involuntary furlough resulted from any contract with a third party. Therefore, this grievance cannot be found timely on the basis that it alleges a violation of

ALL-5001/15 (Covered Work–Time Frames)                                    14

Article Two, Paragraph F, as was the case presented before Arbitrator Hill in MCO-R-0885/11.

     For the above reasons, the Union has been shown to have Company violated time frames by filing the instant grievance too late. In accordance with Article Twenty, Section One, Paragraph C, the costs of the arbitration shall be borne by the Union.

## AWARD

     The grievance is dismissed as untimely filed. In accordance with Article Twenty, Section One, Paragraph C, the costs of the arbitration shall be borne by the Union.

*Elizabeth Neumeier*

Elizabeth Neumeier, Arbitrator

August 20, 2016