DR. DANIEL F. JENNINGS

IMPARTIAL ARBITRATOR

| | | |
|---|---|---|
| In the Matter of Arbitration between | ) | Appointed By The Parties |
| | ) | |
| | ) | |
| | ) | |
| Southwest Airlines | ) | Aircraft Cleaning |
| Dallas, Texas | ) | Grievance No TWU-ALL-5000/16 |
| | ) | |
| and | ) | |
| | ) | |
| Transport Workers Union of America, | ) | |
| AFL-CIO; Air Transport Local 555 | ) | |

OPINION AND AWARD OF THE ARBITRATOR

December 16, 2016

1

EXHIBIT 3

## Table of Contents

| Topic | Page Number |
|---|---|
| Introduction | 3 |
| Issue | 4 |
| Arbitrability | 4 |
| Relevant CBA Provisions | 4 |
| Position of the Company | 6 |
| Position of the Union | 25 |
| Opinion of the Arbitrator | 33 |
| Award | 38 |

## ARBITRATION AWARD

In the Matter of:

Southwest Airlines
Dallas, Texas

     and

Transport Workers Union of America, AFL-CIO Transport Local 555

| | |
|---|---|
| FOR THE COMPANY: | Kevin Minchey, Esq.<br>Assistant General Counsel |
| FOR THE UNION: | Cortney Heywood<br>Vice President |
| IMPARTIAL ARBITRATOR: | Dr. Daniel F. Jennings<br>Department of Industrial Distribution<br>MS # 3367<br>Texas A&M University<br>College Station, Texas 77843-3367 |

By the terms of the agreement between Southwest Airlines, hereinafter referred to as the "Company," and the Transport Workers Union of America, Local 555, Representing Ramp, Operations, Provisioning and Freight Agents, hereinafter referred to as the "Union," Dr. Daniel F. Jennings, Texas A&M University, College Station, Texas, was selected by the Parties to serve as impartial arbitrator. A hearing was held in the Conference Room of the DoubleTree Motel at 3300 West Mockingbird Lane in Dallas, Texas on October 6, 2016. Full opportunity was afforded the parties for the introduction of evidence, examination and cross-examination of witnesses, and oral arguments. Post-hearing briefs were filed. These proceedings were declared closed on November 18, 2016

ISSUES

(a) Was the present grievance filed in a timely manner? If not, what is the appropriate remedy?

(b) Should the present grievance be dismissed under the doctrine of res judicata? I not, what is the appropriate remedy?

ARBITRABILITY

Both Parties agreed at the beginning of the present hearing that the present case is properly before this Arbitrator.

PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

ARTICLE TWO—SCOPE OF AGREEMENT
...
F. Third Party Contracting: The Company and the Union agree that job security and a stable work environment are important objectives to be maintained. Therefore, the Company agrees that contracting with third parties shall be prohibited if it results in a reduction in force or involuntary furlough. It is the intent of both parties that covered work to be done by [Company] employees.

    1.    Should the Company have a need to contract with third parties for the performance of covered work, the Company shall notify the Union of:

        a.    The nature of the contract; and
        b.    The anticipated length of time the third party shall be required.

The Company and the Union agree to discuss the time frames in an attempt to minimize such third party work and return same to covered Employees. No such contracting shall occur when and if adequate facilities are available for the Company's operations, ramp and/or freight needs.

ARTICLE THREE—STATUS OF AGREEMENT

A. Ratification: It is expressly understood and agreed that, when this Agreement is accepted by the Company and ratified by the membership of the Union, it shall be binding o both the Company and the Union and shall supersede any and all agreements existing or previously executed between the Company and the

Union and/or any other organization representing the employees covered hereunder.

...

F. <u>Amendments</u>: Either party may propose in writing to the other party any amendment which it may desire to make to this Agreement. No amendment hereto shall be valid unless in writing and duly and properly executed by the Vice Presidents of Ground Operations and Provisioning and the President of the Union.

## ARTICLE FIVE—CLASSIFICATIONS

### Section One—Ramp Agent/ Provisioning Agent

The work of Ramp and Provisioning Agents includes the functions which have been historically performed by agents at [the Company] stations and includes, but is not limited to, any of the following work covered under this specific labor contract. Agents required to perform such duties must be current and qualified within that classification.

...

H.   Equips aircraft cabin interiors for flights with equipment and supplies such as blankets, literature, disposal and refuse containers, and commissary items (including ice) in accordance with applicable paperwork.

I.   Hand clean interior of aircraft by such operation as hand sweeping and dusting, empties ash trays, and uses specialized cleaning fluids and materials, using mechanical cleaning aids as required, in accordance with applicable paperwork.

J.   Removes stains from upholstery; cleans windows; and cleans and services lavatories and galleys and disposal containers, in accordance with applicable paperwork.

K.   Transports cabin, commissary, and cleaning equipment between aircraft and storage areas.

...

M.   Maintains an inventory of cabin equipment items, commissary items, and cleaning equipment and supplies, including the storage areas for such supplies and notifies local management of possible materials needed.

### Article Twenty—Grievance/ System Board/ Arbitration

### Section One—Procedures

...

C.   <u>Cost of Arbitration</u>. It is understood and agreed that the cost of arbitration shall be borne by the losing party.

...

Discharge and Discipline

…

L.      Interpretation/Application of Agreement. In the event of a grievance arising over the interpretation of, or application of, this Agreement ("Contractual Grievances"), or in the event of a grievance involving disciplinary action other than discharge ("Disciplinary Grievances"), the following steps shall apply. However, in the event of a grievance involving discharge or a Union grievance concerning a change in Work Rules ("Discharge/Work Rule Grievances"), it shall proceed to sub-paragraph 3, below. Decisions made pursuant to Steps 1 through 3, below, shall not constitute precedent of any kind unless agreed to, in writing, by the Union and the Company. If a termination is grieved, insurance benefits will continue until all grievance procedures have been exhausted and a final decision has been rendered. Employees are required to continue to pay the premiums when they are due; failure to do so will result in termination of insurance benefits.

…

3.      Step 3/Labor Relations or designee. If the decision of the Station/Provisioning Manager is unsatisfactory, the District Representative/designee of the Union may appeal the grievance to Labor Relations or designee, provided that such appeal is presented, in writing, within ten (10) working days after receipt of the Station Manager's decision. The grievance shall be answered, in writing, to the District Representative /designee of the Union by Labor Relations or designee within (10) working days of receipt of the grievance.

…

14.     Arbitration/ Function and Jurisdiction: The functions and jurisdiction of the Arbitrator shall be fixed and limited by this Agreement. He shall have no power to change, add to, or delete its terms. He shall have jurisdiction only to determine issues involving the interpretation or application of this Agreement, and any matter coming before the Arbitrator which is not within his jurisdiction shall be returned to the parties without decision or recommendation. In the event any disciplinary action taken by the Company is made the subject of proceedings, the Arbitrator's authority shall, in addition to the limitations set forth herein, be limited to the determination of the question of whether the Employee(s) involved was disciplined for just cause. If the Arbitrator finds that the penalty assessed by the Company was arbitrary or unreasonable, he may modify or remove that penalty.

EXECUTION PAGE

Signed this 16th day of March, 2016

POSITION OF THE COMPANY

By way of background, the Company explains that the Union has filed two grievances alleging that the Company has failed to adhere to the Collective

Bargaining Agreement (CBA) by allowing contractors or non-covered employees to perform aircraft cleaning work. Such work has been performed on Remote Over Night (RON) aircraft. On October 29, 2015 the Union informed the Company that RON aircraft cleaning was covered work for the Company's Ramp Agents and members of the Union and that the Company had until November 15, 2015 to cease and desist the practice of allowing contractors and non-covered employees to perform RON aircraft cleaning.[1] The Company responded that it has a long-standing practice of using Provisioning Agents (TWU members), Appearance Technicians (represented by AMFA), Flight Attendants (represented by TWU 555), third-party vendors and others to perform RON aircraft cleaning. On November 16, 2015 the Union filed a grievance which moved to an arbitration hearing on August 20, 2016.

The CBA in effect at that time stated that if the Union believed the Company was violating the CBA by contracting out RON aircraft cleaning work, the Union had to file a grievance within 10 working days from when the Union first had knowledge of the alleged violation. It was undisputed during the August 20, 2016 arbitration hearing that the Union had knowledge decades ago that the Company was allegedly violating the CBA by contracting out the work of RON aircraft cleaning. Following the conclusion of the August 20, 2016 arbitration, Arbitrator Elizabeth Neumeier ruled that the Union failed to file a grievance when it first had knowledge that the Company was contracting out RON aircraft cleaning. However, Arbitrator Neumeier denied that grievance on the grounds

---

[1] The Union informed the Company that it [the Union] was willing to meet with the Company to discuss specific cities in which the November 15, 2015 date could not be achieved.

7

that it was filed untimely. Thus, the Union's November 16, 2016 grievance was denied.

On March 28, 2016 the Union filed the second grievance alleging that the Company has failed to adhere to the Collective Bargaining Agreement (CBA) by allowing contractors or non-covered employees to perform aircraft cleaning work. The basis for the second grievance was that a new CBA had been negotiated by the Parties.

In developing its position, the Company presents the following eight elements on a point-by point basis:

(a) The grievance should be dismissed under the Res Judicata Doctrine:

The Company explains that Arbitrator Marvin Hill wrote extensively on the res judicata doctrine as follows:[2]

> If the issue is the same, the contractual language is the same, the same arguments are being made, and the arbitrator cannot find any significant factor that would warrant ignoring the first award, then relitigation of the issue should not be allowed.
> Clearly, an arbitrator should ordinarily apply concepts of res judicata/ preclusion and not allow a party to relitigate an issue that was the subject of a prior arbitration. The need for finality and consistency, as well as the need to maintain the integrity of the grievance and arbitration mechanisms, mandate this result, even though the second arbitrator might have ruled differently.

Other arbitrators have found the same. For example, Arbitrator Sergent ruled as follows:[3]

---

[2] *Southwest Airlines v TWU Local 555* (McNamara Grievance); Company Exhibit #13, pp. 19-20
[3] *American Airlines v Transport Workers Union, Local 591*, (2015) AAAD 35,11, (Arbitrator Sergent )

In short, where there has been a prior decision regarding a dispute between the same parties, at the same operation, on the same fact pattern, and involving the same contractual provisions and issues, then that decision is to be taken as final and binding unless one of the recognized situations exist for not applying the principle. Recognized situations in which res judicata should not be applied include those where the arbitrator exceeds his jurisdiction or authority; or where conditions have materially changed in such a way as to render a prior decision inappropriate to present circumstances, and/or where a previous award appears on reexamination to be clearly erroneous.

Similarly, Arbitrator Hooper ruled:[4]

If this arbitrator were to ignore the earlier decision and issue a contrary decision merely because he preferred a different interpretation, the parties would be right back where they were when the dispute first arose. They would have gone through the trouble and expense of two arbitration cases without having their dispute resolved. If the Company were to prevail this time, the parties would be deadlocked at a score of 1 to 1. Under these conditions, no one should be surprised if the Union wanted another turn at bat. Like an extra-innings baseball game, the dispute could potentially go on indefinitely and never be resolved if each subsequent arbitrator felt free to go his own way with the issue. That would defeat the purpose of the arbitration clause and deprive the parties of any degree of confidence in what the contract means. They would not be well served by that.

Further, following are other arbitral decisions pertaining to res judicata:

Finding in favor of the company where there was no significant difference between the previously-decided case and the instant case because "the applicable language as well as the overtime guidelines of the CBA which govern this dispute remain unchanged [5]

In effect, Res Judicata holds that a prior arbitration award is to be given preclusive effect if it is between the same parties; it invokes the same fact

---

[4] *Monarch Tile, Inc.,* 101LA 585 (Arbitrator Hooper)
[5] *American Airlines v Transport Workers Union, Local 567,* AAAD 37, 12-14 (2015) (Arbitrator Sergent)

situation(s), pertains to the same contractual provisions, is supported by the same evidence and concerns the interpretation of the specific agreement.[6]

Where as here, the prior decision involves the interpretation of the identical contract provision, between the same company and union, every principle of common sense, policy, and labor relations demands that it stand until the parties annul it by a newly worded contract provision.[7]

The City explains that Legal scholars have also agreed that the doctrine of *res judicata* should apply to labor arbitrations.[8] Prior labor arbitration awards that interpreted the existing terms of a contract between the same parties are not binding in exactly the same sense that authoritative legal decisions are, yet they may have a force that can be fairly characterized as authoritative.[9] Were the parties free to repeatedly submit the same issue to arbitral resolution, 'shopping' for a different result, the 'common rule' of the work place would be destroyed. Contract terms are expected to be applied uniformly to all similarly situated employees.[10] The underlying rationale of recognizing prior awards as res judicata in subsequent cases is based on the desirability of continuity and consistency of contract interpretation and the need for finality.[11] In spite of an arbitrator's freedom from the restraints of stare decisis, when a prior arbitrator has rendered an award in a dispute between the same employer and the same union, the

---

[6] *American Airlines, Inc. DFW and TWU, Airport Transport Division,* 105 AAR 159 (2005) (Arbitrator Bernard)
[7] *Pan American Refining Corp.,* 9 LA 731 (Arbitrator McCoy)
[8] See Elkouri & Elkouri, *How Arbitration Works,* 7th ed. 2012, pp 11-7, 11-8,
[9] Ibid, p. 11-10
[10] See Owen Fairweather, *Fairweather's Practice Procedure Labor Relations,* 4th ed, 1999, Chapter 17
[11] Ibid, p. 225
[12] Ibid

precedential effect of the prior award is no longer an issue of stare decisis, but rather res judicata.[12]

(b) *The two grievances are the same:*

The present case and the case before Arbitrator Neumeier involved a dispute between the two parties, at the same operation, on the same fact pattern and involving the same contractual provisions and issues:

- **Issue**: The issues in the first grievance are the same issues that are present in this matter, which is whether the grievance was timely filed under the CBA and whether it is a violation of the CBA for the Company to contract out aircraft cleaning work.

- **Contractual language**: The relevant contractual language (Articles Two, Five, and Twenty) is the same in both cases. And the fact that the present grievance was filed after a new CBA was ratified is irrelevant because the applicable contract language did not change. So the contractual language that Arbitrator Neumeier interpreted and applied is the same language that the Union is asking this Arbitrator to interpret and apply.

- **Arguments**: The same arguments are being made by both parties. The Company is arguing in both cases that the Union should have filed the grievance in the 1980s when the Company first started contracting out RON aircraft cleaning work or at the latest in 1999 when the last station stopped having Ramp Agents perform aircraft cleaning. In response, the Union argued in both cases that the Company's contracting out the RON cleaning work is a continuing violation – either because the alleged violation occurs each day or, with respect to the present grievance, because there is a new CBA.

- **Zipper Clause**: The Union even raised the zipper clause as a defense against the untimeliness of its grievance in the case before Arbitrator Neumeier, and that argument was rejected by her.[13]

---

[13] See Company Exhibit #14

Arbitrator Neumeier rejected all of the Union's arguments—the same ones the Union is making here—and found that the grievance was untimely because it should have been filed years ago when the Union first had knowledge of the alleged contract violation. This Arbitrator must follow that decision under the doctrine of *res judicata* for the sake of finality and consistency, as well as the need to maintain the integrity of the grievance and arbitration mechanisms

(c) *The present grievance is untimely:*

Based on the preceding statement, the present grievance, just as the first grievance, alleges that the Company is in violation of the CBA "by allowing contractors or other non-covered employees to perform functions that are clearly outlined as job duties of Ramp Agents, TWU members." But the subcontracting of work is an action by the Company, and not a passive "allowing contractors…to perform…job duties of a Ramp Agent[s]."   Subcontracting is the result of Company analysis, bidding process, and formal awarding of contracts and assignment of the work to contract employees.   In the prior grievance, Anne Naylor described how the Company undertook exactly such a process in 2007-2008 to consolidate some 20 plus existing local vendors into 5-6 national contractors performing aircraft cleaning.[14]

The Union cites solely *Article Five – Classifications*, from the CBA for its allegation that the Company has violated the CBA by contracting Ramp Agent work. But subcontracting is actually controlled by Article Two, Section F – *Third Party Contracting,* of the CBA which focuses on the Company's decision to subcontract work, including the need for subcontracting, whether it will result in

reduction in force, and the duration. Thus, the contract language relating to third party contracting focuses on the timing and justification for a Company decision to subcontract, and not as the language of the Grievance suggests, the Company passively "allowing" contractors to perform work.

The Company maintains that it is undisputed that the applicable timeframes provision is CBA Article 20(L)(3), which requires the Union to file a group grievance "within ten (10) working days" when the Union has knowledge of the alleged violation of the CBA, **not within 10 days from a new CBA** [emphasis added]. [15] Indeed, all of the witnesses that were asked about this matter from both the Company and the Union testified consistently about the applicable time frames. Following is a summary of that testimony:

Testimony by Dan Kusek, Sr. Manager of Labor Relations [16]

Q.     . . . Mr. Kusek, when must the Union file a grievance alleging that the Company violated a provision of the CBA?

A.     When they first have knowledge of an alleged violation, within ten days.

Q.     It's not based on the ratification of a new CBA?

A.     Never -- yeah. That's never been stated from either side prior to today.

Michelle Jordan, Director of Labor Relations [17]

Q.     What is the time frame for the Union to file a grievance alleging a violation of the CBA?

A.     It has ten days from the date of knowledge.

---

[14] Company Exhibit #2; Arbitration Hearing Transcript, p. 33
[15] Joint Exhibit #1, Arbitration Hearing Transcript, pp 65, 67, 71, 78-79, 81, 87-88, 92-93, 98-99, 101, 109-10, 135, 142-43, 155, 164-65, 170, 173, 181
[16] Arbitration Hearing Transcript, p. 110, lines 1-9
[17] Ibid, p. 135, lines 2-8

Q.     Okay. Have you ever seen a grievance filed or an argument made that it's within ten days of the ratification of a new CBA?

A.     No, I've not.

Charles Cerf, Immediate Past President of TWU Local 555 [18]

Q.     . . . isn't it true that the Union has to file a grievance within ten working days of when it becomes aware that the Company has violated the contract?

A.     Yes.

* * *

Q.     Are you saying that the Union wasn't aware that the Company was contracting out cleaning work to vendors until March 16, 2016?

A.     They were aware.

Q.     That's been going on for decades?

A.     Yes.

Q.     **And once the Union is aware that the Company is allegedly violating the contract, it has ten working days to file a grievance. Isn't that accurate** [emphasis added].

A.     **Yes** [emphasis added].

Greg Puriski, Current President of TWU Local 555 [19]

Q.     Were there any changes in the language from the red book [2008-2012] to the current CBA, the black book [2016-2021], regarding aircraft cleaning?

A.     No.

Q.     Were there any changes regarding Company contracting out work to vendors to clean aircraft?

---

[18]. bid, p. 170, lines 1-5; p. 172, lines 22-25; pp. 173, lines 1-6
[19] Ibid, p. 180, lines 18-25; pp. 181,   lines 1-14

A.    No.

Q.    Were there any changes regarding the time frames in Article 20 of when the Union has to file a grievance alleging a contractual violation?

A.    On time frames, I do not believe there was a change in the language on that, on time frames.

Q.    What is that time frame?

A.    Time frames is the amount of time that we have to file a grievance and how long you have to – the other party has to respond.

Q.    And what is that for the Union filing a grievance alleging the Company has violated a contract?

A.    Ten working days.

Q.    From what point?

A.    **From when we become knowledgeable of the incident** [emphasis added]

In sum, under the plain language of the CBA and based on the undisputed evidence in the record, the applicable time frames for this grievance is 10 working days from when the Union had knowledge the Company was contracting out aircraft cleaning that had been performed by Ramp Agents, which the undisputed record establishes occurred **sometime in the 1980s** [emphasis added] or at the latest when the Company completely contracted out all RON aircraft cabin cleaning **before 2000** [emphasis added]. Under either reference point, the relevant time for a timely grievance under Article 20(L)(3) and Article 2(F) is long since past. Indeed, as stated above, the record demonstrates a 30 plus year history of the Company contracting RON aircraft cabin cleaning, and

the complete subcontracting of RON aircraft cleaning by 2000, with Union acquiescence.[20]

   (d)   *The CBA applies a strict 10 day timeframe for challenging a Company action which has not been met:*

The Company maintains that grievance time limits have been taken seriously by the Company and have been strictly applied.[21] As Arbitrator Sisk has stated:[22]

> It may appear to some that the enforcement of time limits makes the grievance procedure too legalistic. Such is not the case. One of the main values to be gained from a strict enforcement of time limits is the elimination of stale grievances. Both Union and Company representatives can then address current issues... Similarly stale grievances without adequate documentation and witnesses testifying about recent events makes unworkable awards by arbitrators and perpetuates an ineffective and inefficient grievance procedure.

The Company explains that at times, a late filing of a grievance can be excused with extenuating circumstances, but only with evidence of such circumstances:[23]

> On occasion arbitrators rule on the merits of a case, even though an arbitrability question has been raised, on the grounds that there has been 'substantial compliance' with the specified time limits. Substantial compliance may be found when the filing is late because of illness, accident, or ambiguity in regard to the counting of holidays or vacation days. It is difficult to imagine

---

[20] Ibid, 153-54, 182-83; 27-28, 31-33, 45: Company Exhibit #2
[21] Joint Exhibit #3, Company Exhibits #8 and #9
[22] Joint Exhibit #3; Company Exhibit #10
[23] Ibid

conditions that would warrant considering a 28 day delay as substantial compliance…

As Arbitrator Vernon stressed: "Neither Grievants nor the Company can avoid the tolling of time limits by a lack of simple diligence after a known event occurs…Reasonable diligence is clearly implied in the language."[24]

Against this context, the questions are whether the Union exercised reasonable diligence in pursuing a grievance challenging the Company's subcontracting of RON aircraft cabin cleaning, or whether there were extenuating circumstances justifying the delay. On the record – both in the first grievance and in the present case – these questions were only answered in the negative. In fact, the record demonstrated that the Union "chose not to do anything" regarding the Company's long term subcontracting of aircraft cleaning.  At the hearing in the first case, the Union even made a strategic decision to present no evidence, and instead, simply stated: "[A]s the Company is the moving party; we don't feel they've met their burden and the Union rests." [25] Similarly, in the present case, although the Union representatives admitted they had to file a grievance within 10 working days after they had knowledge the Company was contracting out RON cabin cleaning work, they offered no explanation for why no grievance was ever filed. Since the Union made no effort to present extenuating circumstances for not filing a grievance challenging the subcontracting of RON aircraft cabin

---

[24] Joint Exhibit #3, Company Exhibit #9
[25] Company Exhibit #2, Arbitration Hearing Transcript, pp. 61

cleaning, and the practice began years ago, this Arbitrator must conclude there simply is no reason to not apply the 10 day limitation that the contract mandates.

*(e) A new CBA does not make the present grievance timely:*

During the Present arbitration hearing, the Union argued that the present (or second grievance) was filed on a timely basis because the ratification of a new CBA did so. However, the Company contends the Union's argument fails on two grounds: the "continuing violation" theory under a new CBA is flawed; and the plain language does not provide what the Union thinks it does.

At the Company, a Union's failure to file a timely grievance does not get excused by the mere invocation of the words "continuing violation" or because a new CBA was ratified.[26] More importantly, the CBA at Article 20(F) expressly limits the grounds for arguing an Extension of the Time Frames for filing a grievance:[27]

> Further, in the event either party, due to circumstances beyond the reasonable control of such party, does not become aware of, or is prevented from disclosing, facts or circumstances which would give rise to either a factfinding or a grievance, the time frame for pursuing such factfinding and/or grievance shall be extended as appropriate.

The question the CBA poses is: why did the Union not file a grievance when the "facts or circumstances" forming the basis for the grievance arose? As explained above, however, the Union made no effort to provide an evidentiary basis for its more than decade long delay, and admitted that the delay occurred because the Union "chose not to do anything." Having made no effort to meet the express

---

[26] Company Exhibit #9
[27] Ibid, p 40

contractual criteria for justifying a delayed filing, the Union cannot circumvent the timeframes by simply asserting that the circumstances present a "continuing violation."

The Union's reliance on CBA *Article 5 – Classification* also is misplaced. The provision states:[28]

> The work of Ramp...Agents includes the functions which have been historically performed by such agents at Southwest Airlines stations and included, but is not limited to, any or all of the following work covered under this specific labor contract. Agents required to perform such duties must be current and qualified within that classification.

While the contract says that Ramp Agents may be "required to perform such duties," nowhere does it say that any of the specified duties in Article 5 are the exclusive work of the craft or class.[29] Indeed, in the present matter, there is uncontested evidence that the work in question, RON aircraft cabin cleaning, has also been performed by Southwest Appearance Technicians under a CBA with AMFA.[30] Subcontracting is, in fact, controlled by CBA Article 2(F), a provision which entered the CBA in 1995. Since the record establishes that the Company subcontracted aircraft cleaning work at many stations before 1995, the Union cannot even show that the relevant CBA provision was in place at the times subcontracting was implemented at many stations.

In short, the Union's cursory plain language case, which neither contests the Company's evidence, nor provides any explanation for a more than decade long delay in challenging the Company's subcontracting of RON aircraft cabin

---

[28] Joint Exhibit #1, p. 10
[29] Joint Exhibit #2; Arbitration Hearing Transcript, pp. 59-60
[30] Company Exhibit #2; Arbitration Hearing Transcript, pp. 24-26

cleaning, does not meet the CBA requirements for establishing a timely grievance.

*(f) Even if the new CBA were a trigger, the present grievance is untimely:*

The Company contends that even if the ratification of a new CBA were the trigger to file a new grievance, which it is not, the present grievance – filed on March 28, 2016 – was not filed within 10 working days of February 19, 2016, the date the CBA was ratified and became fully enforceable and effective. **The Company maintains the present CBA was effective and enforceable on the date of ratification, not the date the agreement was formerly signed** [emphasis added].

The Union initially argued that the present grievance had to be filed within 10 working days after the new CBA was ratified.[31] But when the Union realized that it erred on the ratification date, it changed its position in the middle of the case and instead argued that the grievance only had to be filed within 10 working days after the CBA was signed. However, a federal court examined this issue and found that parties cannot withdraw from a collective bargaining agreement once it is ratified.[32] Therefore, once Union members ratify a new CBA—not when the agreement is signed—it becomes effective and enforceable.

The Company explains that this concept is stated clearly in CBA Article 29 which states the CBA "shall remain in full force and effect as of the date of ratification [February 19, 2016] through and including February 18, 2021", as well

---

[31] Joint Exhibit #4, p. 6; Arbitration hearing Transcript, pp. 112, 129-130
[32] *Transp. Workers Union of Am v Hawaiian Airlines, Inc.*, 2009 WL 972483 (D.Haw., Apr 8, 2009, aff'd 344 F. App'x 351; 9th Cir 2009)

as in the zipper clause in CBA Article 3 which states: "when this Agreement is accepted by the Company and ratified by the membership of the Union, it shall be binding on both the Company and the Union." Clearly the acceptance of the CBA by the Company occurs before ratification.[33]

During the present arbitration hearing, the Union relied on the CBA implementation schedule to argue that the CBA was effective after it was signed, not upon ratification. But the implementation schedule only showed that a few of the new provisions in the new CBA were effective after the agreement was signed, and none of those provisions were relevant to the present grievance. [34]

Even the President of the Union testified that the articles in the CBA that were not changed were not listed on the implementation schedule and were, therefore, effective and enforceable as of the date of ratification – February 19. 2016.[35] Consequently, a grievance alleging the Company was in violation of CBA Articles 2 and 5 had to be filed within 10 days of February 19, 2016 if not sooner.

It is also important to note that both sides agreed that no changes could be made to the new CBA after it was ratified unless there was a mutually agreed to by a side letter agreement.[36] The Company contents that the preceding side letter agreement is further indication that the present agreement was fully effective and enforceable on February 19, 2016.

---

[33] *See Hawaiian Airlines*, p 10 (holding that an employer may withdraw its assent to a CBA only before a union's members ratify the contract).
[34] Company Exhibits #16 & 17; Arbitration Hearing Transcript,, pp. 115-122, 138-139, 174
[35] Arbitration Hearing Transcript p. 193
[36] Ibid, pp. 48, 74

### (g) The zipper clause is not relevant:

The Company explains that without a reference to any authority, the Union argued that the zipper clause in CBA Article 3(A) created "a different set of time frames" and "nulled and voided any previous agreement (whether the language of the specific article changes or not)."[37] But the Union admitted during the arbitration hearing that the zipper clause has been in all of the previous CBAs with the Company.[38] Also Union witnesses acknowledged that if the Company actually did what the Union argued in this case and voided an agreement upon ratification of the new CBA, the Union would file a grievance challenging such an action.[39] So the Union is really arguing out of both sides of its mouth regarding the so-called zipper clause. For example, there is a long-standing agreement between the parties outside of the CBA to pay 3 hours of regular pay per day as a penalty for pay shortages.[40] This is an agreement that is favorable to the Union and its members. As a result, the Union admitted at the arbitration hearing that it does not believe that the pay shortage agreement with the Company is null and void with the new CBA. [41] Instead, the Union only wants this Arbitrator to find that prior agreements and arbitration decisions that it does not like should be null and void with a new CBA.

However, the Company states that this is obviously not how a zipper clause works. Instead, a zipper clause works exactly as it is written, which is that

---

[37] Joint Exhibit #4, p. 5
[38] Arbitration Hearing Transcript, p. 55
[39] Ibid, pp. 160-163
[40] Ibid, p. 159
[41] Ibid, p. 163

the new CBA supersedes any previous agreements between the parties and becomes the new enforceable agreement after it has been "ratified by the membership of the Union."[42] All prior agreements between the parties that are not inconsistent with the new CBA are still effective and enforceable, such as the pay shortage agreement and the finding by Arbitrator Neumeier that the Union is out of time to file a grievance challenging the Company's decision to contract out cleaning work.

*(h) The established past practice of subcontracting cleaning work:*

Regardless of the time frames arguments, the record before Arbitrator Neumeier and this Arbitrator clearly establish a long-standing past practice of subcontracting out aircraft cleaning work at the Company. This established past practice constitutes an implied term of the new contract that this Arbitrator cannot change, add to, or delete under CBA Article 20(L)(15).[43]   "Finally, if the application of these principles and standards establishes a past practice, such practice can be considered an implied term of the CBA, attaining the status of contractual rights, particularly where it is not at variance with any written provision negotiated into the agreement by the parties and **where they are long standing and were not changed during subsequent negotiations**" [emphasis added).[44]

Indeed, because the practice of contracting out aircraft cleaning was continued during negotiations of the new CBA and after the new CBA was

---

[42] Joint Exhibit #1, p.6
[43] *American Eagle Airlines, Inc.*, 2014 AAAD 231 (2012) (Arbitrator Fishgold)
[44] Ibid

ratified, the Company's right to contract out this work is incorporated into the new CBA regardless of whether the present grievance was timely filed.[45] Arbitrator Helburn ruled: [46] "The practice of the Company providing coffee to be taken from the flight operations area to the aircraft by pilots in Memphis **was continued during negotiations and thus incorporated into the existing Agreement by the parties** [emphasis added].

Arbitrator Daniel [47] found in favor of the company and ruled that an established past practice in regard to the vacancy bid process where the record revealed no union question or objection to the practice until the union filed a grievance, which established the presumption that the union was "deemed to have accepted the practice"

Arbitrator Berger ruled:[48] "A collective bargaining agreement should be deemed, unless a contrary intention is manifest, **to carry forward for its term, the major terms and conditions of employment not covered by the agreement**, [emphasis added] which prevailed when the agreement was executed."

Arbitrator Jones stated: [49] The union in no way protested the company's policy. In short, there was a binding past practice which became a contractually

---

[45] *Federal Express Corporation*, 102 AAR 0075, 8 (2005)
[46] *American Eagle Airlines*, 2014 AAAD 231(Arbitrator Helburn)
[47] *Grand Haven Stamped Prods. Co.*, 107 LA 131 (Arbitrator Daniel)
[48] *Kansas City Power and Light Co.*, 105 LA 518 (Arbitrator Berger)
[49] *Alpena Gen. Hosp.*, 50 LA 48 (Arbitrator Jones)

enforceable obligation between the parties." Arbitrator Jones ruled:[50] "It is generally accepted that certain, but not all, clear and long standing practices can establish conditions of employment as binding as any written provision of the agreement."

In conclusion, the present grievance is identical in all meaningful aspects to the grievance previously ruled on by Arbitrator Neumeier. Thus, the present grievance should be dismissed under res judicata or the claim preclusion doctrine. In addition, the record in both cases clearly establishes there is no factual or contractual basis for the non-application of the 10 working day grievance filing rule under CBA Article 20(L)(3) with respect to the present grievance given that all aircraft cleaning work in question was subcontracted to vendors over a decade ago.

Therefore in accordance with CBA Article 20(L)(E), if the time frames set forth in the CBA are violated by the Union, this Arbitrator should dismiss the present grievance (Grievance No TWU-ALL-5001/16) on the grounds of untimeliness.

POSITION OF THE UNION

The Union presents the Company's arguments for the present dispute as follows:

A.   The present Union grievance is barred from being heard based on the claim preclusion doctrine res judicata;

B.   Union grievances 5001/15 and 5000/16 group grievances are the same;

C.   The Union's grievance, 5001/15, was not timely filed even by its own claim;

---

[50] Ibid

D.   Allowing case 5000/16 to proceed under the Union's arguments would render dozens of prior arbitration decisions null and void.

Following are the Union's defenses to the preceding Company arguments:

A.   The Claim Preclusion Doctrine is an affirmative defense barring the parties from litigating a second time on the same claim, or any other arising from the same claim that **could have** [emphasis added] been, but was not raised initially. The  Union could not have argued the perspective of a new Collective Bargaining Agreement (CBA) which was yet to be implemented at the time of the arbitration hearing for 5000/15.

B.   The CBA establishes specific, ten (working) day[51], time frames for the filing of grievances.

C.   The CBA features what is commonly referred to as a zipper clause.[52] As a result, any prior agreements or arrangements are null and void and the Agreement shall be the one, true, governing agent.

D.    The classification job duties specifically include the job duties of cleaning the air craft that Remote Over Night.

ANALYSIS

The Union maintains that the Company is attempting to convert a time frame win in 5000/15 into a merit win in 5000/16, despite the unambiguous language of the Union's page 1 grievance in 50001/16 in which the **recent negotiations were explicitly referenced** [emphasis added]. Because the second grievance is tied directly to the issuance of the new agreement, it is a different argument and a different case; it inherently has different timeframes. The Company Argument that awarding this grievance would nullify scores of Arbitration awards and unwritten work rules is without merit. There is a longstanding labor practice which states that if either party wishes to nullify a

---

[51] CBA Article 20 § 1L provides that a Union grievance over the change in work rules proceed to CBA Article § I.3 which allows for 10 days to move the grievance.
[52] CBA Article 3A provides that "it shall be binding on both the Company and the Union and shall supersede any and all agreements."

past practice then they should do so without contract negotiations. In "Management Rights," Arbitrators Hill and Sinicropi explain that:[53]

> There is authority that if during contract negotiations either party should object to the continuation of a practice, it **could not reasonably be inferred from the execution of a new contract that the parties intended the practice to remain in force.** [emphasis added].

In the instant case, the present arbitrator heard **unrefuted** [emphasis added] testimony from TWU 555 President and (lead negotiator) that the Company was properly informed of the Union's intent to return to the language of Article V. Following is testimony from the present arbitration hearing.[54]

Q—Questions from the Company's Advocate;  A—- Responses from Gary Puriski

Q.    Why did you want to have a conversation with them regarding aircraft cleaning?

A.    Because I believed that it was in our current contract. It needed to be – I wanted to start enforcing the – let us be able to be working on the – language that was in the   contract, and I wanted to make – that was it.

Q.    Okay, and did you talk to anyone from the Company about that?

A.    Yes, we did. I talked to Mike Ryan about it –

Q.    Okay.

A.    --And Gary Kelly

Q.    Okay. And who is Mike Ryan?

---

[53] Hill and Sinicropi, *Management Rights,* (BNA Books, p.55), 1986
[54] Arbitration Hearing Transcript, p. 177,line 4 thru p. 178 line 6

A.    Mike Ryan I believe is the senior director of labor relations.

Q.    Okay. He hasn't been promoted outside of that?

A.    I'm not sure of his exact—

Q.    Okay

A.    --title.

Q.    Did you speak to anyone else bout the aircraft cleaning issue?

A.    Yes, I spoke with Gary Kelly.

Q.    And who is Gary Kelly?

A.    Gary Kelly is the CEO of Southwest Airlines.

Q.    What did Gary Kelly say about the aircraft cleaning issue?

A.    Gary Kelly told me on the telephone call that we had on Friday afternoon that he would not be able to continue negotiations as long as the aircraft cleaning grievance was active.

Q.    Okay. And which grievance – was that the 2015 grievance, I assume?

A.    Correct, we filed it in 2015.

Q.    And did Mike Ryan say anything along those lines to you?

A.    He said the same exact thing.

The Union contends, clearly, that the Company was aware of the Union's intent to return to the negotiated language of the contract. As Mr. Puriski testified, the Company's lead negotiator, Mike Ryan, and the Chief Executive Officer of the Company were both informed of the position by the Union. Upon the implementation of the new CBA, the Company made no efforts to either return the work to the workforce of 555 or to convey to the Union of a certain amount of time needed to finish up any existing contracts with outside vendors.

Based on the reference to the claim preclusion doctrine, the Company's argument is flawed in that it ignores that the act of the covered work, in the instant case, did not occur until the first day operating under the newly implemented agreement. The Company's claim in 5001/15 was that the grievance ws not timely filed under the circumstances around that grievance. However, in the instant case, the issuance of the new contract, combined with the zipper clause of Article 3A, results in a different set of time frames for which no claim of Res Judicata is possible. In "Evidence in Arbitration" by Arbitrators Hill and Sinicropi, the Arbitrators reiterated [55] Arbitrator Whitley McCoy's finding in *Pan American Corp.*:

> But where, as here, the prior decision involves the interpretation
> of the of the identical contract provision, between the same
> company and union, every principle of common sense, policy,
> and labor relations demands that it stand until the parties annul it
> by a newly worded contract provision.

Whereas the parties involved did renew the Agreement, and whereas the Company was fully aware of the Union's intent to return to the negotiated language, the grievance is not barred by claim preclusion because the zipper clause of the Agreement officially nullified and voided any previous agreement (whether the language of the specific article changes or not).

CONCLUSION

THE Union explains that the Company's presentation at the present arbitration hearing made two things abundantly clear to the Union. First, and

---

[55] Hill and Sinicropi, *Evidence in Arbitration*, 2nd Ed. (BNA Books, p. 391), 1994

foremost, they waned to muddy the water as much as possible and force the Arbitrator to rehear the case that Arbitrator Neumeier had already ruled on. They desperately want the time frames to start prior to the implementation of the current agreement. Despite the fact that this tactic directly conflicts with their claim to *res judicata* [56] the Company was relentless in their attempts to reintroduce evidence that was considered in Arbitrator's Neumeier's claim. The Union's perspective on this point is much more clear and direct. Arbitrator Neumeier's decision in 5001/15 speaks for itself. When invoking a claim of *res judicata* the Company should simply be arguing why the Union is incorrect (per the Company's opinion} that the implementation of a new CBA and the Company's knowledge of the Union's intent to return to the language would not open the door the door for time frames to begin again. The Union, conversely, feels that the new CBA, coupled with the Company's knowledge of an intended return to the clear and unambiguous language, absolutely opens the door on the issue and resets time frames. Secondly, the Company's attempt to say that even if the Union is right about the door being reopened then they should have grieved following ratification is simply a matter of playing with words. The "Execution Page" is clearly stated on page 89 of the current CBA. The Current Agreement was not executed or implemented until March 16, 2016. There is no way around this.

---

[56] The Company's unnecessary introduction of an award by Arbitrator Hill to explain *res judicata* was again an attempt to muddy the case. While the Union has only the highest degree of respect for Arbitrator Hill, the inclusion of that case seemed to be a suggestion that this Arbitrator would not have been otherwise familiar with the concept. The exhibit's usage in the hearing was without necessity and a slap in the face to all parties involved.

Although there are overlapping themes between this case and that of 5001/15, the element of a new contract having been negotiated between the cases creates crease a situation where a different claim is being made. In 500/15 the Company successfully claimed that the Union had failed in its opportunity to grieve the action of the work being contracted out within the required 10 days. However, whereas, the contract was renewed while the grievance for 5001/15 was still being litigated, and the Company was therefore aware of the Union's intent to return to the language of the contract, the Union's position is that Company should have returned the work to membership of Union (TWU 555) upon ratification and implementarion of the current agreement in March 2016. When the Company failed to do so, the Union filed a grievance within the required time frames. The clear, and unambiguous, language within the agreement provides the duties (at the heart of this disagreement) to the members of the Union (TWU 555).

The Agreement's featured "zipper clause" (CBA Article 3A) expressly states that "*when this Agreement is accepted by the Company and ratified by the membership of the Union it shall be binding on both the Company and the Union and shall supersede any and all agreements existing or previously executed between the Company and the Union and/or any other organization representing the Employees covered hereunder*" [emphasis added]. As a result of this clause, and the Company being fully aware of the Union's intent to return the job duties to its membership, the Company was bound to provide that work. When it did not, the Union filed the grievance time

frames. The act of the covered work, in the instant case, did not begin <u>until the</u> <u>ratification and implementation</u> dates of the current agreement. There could be no claim prior implementation because there was no expectation for work rules to change prior to that. The entire attempt to dismiss, by the Company, stems from their attempt to urge the Arbitrator consider this case to be a matter of *res judicata* because of the overlapping issues with 5001/15. Unfortunately, for the Company, the basis for the Union's argument in the instant case is that the Company was aware (during negotiations [57]) of the Union's intention to return to the language of the contract and chose to neither alter that language nor properly return the work upon implementation and execution.

In Elkouri & Elkouri "How Arbitration Works" [58] it is stated that the defense involving *res judicata* is properly used to prevent the litigation of a second claim "arising from the same transaction or series of transactions and that **could have been – but was not – raised in the first suit** " [emphasis added]. [59]   The emphasis used by the Union should point out that a critical element, of the instant case, <u>could not have been raised</u> (in the form of the newly ratified agreement) because the most recent implementation, at the time of hearing 5001/15, dated back to 2011.

The Company assertion that the case is *res judicata* is without merit due to basis of the Union claim is the ***implementation*** of a new agreement on March

---

[57] Which Union negotiators testified to at Arbitration (both in terms of direct negotiations as well as threats from Company executives)

[58] Elkouri and Elkouri, *How Arbitration Works*, 6th ed. (BNA Books, 2003) , p.387

[59] The quote used by the Elkouris was properly cited in *Black's Law Dictionary* 7th ed., 1321 (1999)

16, 2016 [60] (a date which is unquestionably after the filing of 5001/15). The Union respectfully requests that the Arbitrator dismiss any such motion, by the Company, based on the foregoing grounds.

For all of those foregoing reasons, the Union respectfully requests that the Company's assertion to dismiss be denied, and that this grievance be upheld as being arbitrable and that the grievance be upheld as having been filed in a timely manner.

OPINION OF THE ARBITRATOR

Both parties were well represented for the present case. During the present arbitration hearing the Company expended considerable time in introducing Arbitrator Neumeier's August 20, 2016 arbitral award pertaining to the Union's Grievance 5001/15 dated November 16, 2015 and to a review of arbitral decisions regarding *res judicata*.

Turning to the present case, on March 28, 2016 the Union filed Grievance 5001/16 alleging that the Company had violated Article Five, Section One of a recently negotiated Collective Bargaining Agreement by allowing contractors and non-covered employees to perform aircraft cleaning work on Remote Over Night (RONA) aircraft. Further, during the present arbitration hearing, the Company argued that (1) Grievances 5001/15 and 5001/16 are identical. Thus the present Grievance 5001/16 should be denied based on Arbitrator Neumeier's decision to deny Grievance 5001/15.

---

[60] Page 89 of the new CBA , the *EXECUTUVE PAGE*, notes a signing and implementation date of March 16, 2016

In fashioning a decision for the present case involving Grievance 5001/16, this Arbitrator has considered four factors: (a) Are Grievances 5001/15 and 5001/16 identical?; (b) What are the effects of CBA Article 3A (the Zipper Clause) on the present grievance (5001/16)?; (c) What are the effects of *res judicata* (the claim preclusion doctrine) for the presence grievance (5001/16)?; and (d) Was the present grievance (5001/16) filed on a timely basis? This Arbitrator now responds to the preceding four factors on a point-by point basis with a ruling for each factor.

*(a) Are Grievances 5001/15 and 5001/16 identical?*

With the approval of Article 3A (the zipper clause) of the "new" CBA, existing past practices were nullified which provided the rationale for Grievance 501/16. The nullification of past practices was not applicable for Grievance 5001/15. Based on the preceding history, this Arbitrator is convinced that the two grievances are not identical.

*(b)     What are the effects of CBA Article 3A (the Zipper Clause) on the present grievance (5001/16)?*

By definition, a zipper clause deals with unwritten practices or customs in the written agreement which commonly takes the form of either an acknowledgement that the written contract constitutes the parties entire agreement and is a waiver of the right to bargain about other conditions or a specific affirmation that management rights are not limited by prior practices. If

the language of the CBA is explicit, the binding effect of customs or practices may be eliminated. [61]

CBA Article 3A states in pertinent part:

A. Ratification: It is expressly understood and agreed that, when this Agreement is accepted by the Company and ratified by the membership of the Union, it shall be binding on both the Company and the Union and shall supersede any and all agreements existing or previously executed between the Company and the Union and/or any other organization representing the employees covered hereunder.

Zipper clauses have been utilized in other situations and in other companies by both management and the union. From a management perspective, Arbitrator Jones stated that in *Fruehauf Trailer.* [62]

> The past practices relied upon by the Union were wiped out by the zipper clause inasmuch as that provision made nugatory all agreements existing previous to the instant agreement except as they might be embodied in the instant agreement.

In *Fruehauf Trailer,* the zipper clause stated:[63]

> This contract supersedes and cancels all previous Agreements, both written and oral, and constitutes the entire Agreement between the parties hereto:

From a union perspective, Arbitrator Fox ruled in *George Failing:*[64]

> The zipper clause precludes the company from relying on past practice and constitutes the parties' entire agreement.

In *George Failing,* the zipper clause stated:[65]

---

[61] *Elkouri & Elkouri, How Arbitration Works,* 7th Ed. Kenneth May, Editor-in-Chief, (Arlington, VA: Bloomberg BNA Books, 2012, Chapter 12, pp, 17-21.
[62] *Fruehauf Trailer,* 29 LA 372 (Arbitrator Jones, 1957)
[63] Ibid
[64] *George E. Failing Co.,* 93 LA 598 (Arbitrator Fox, 1989)
[65] Ibid

> It Is understood and agreed that this Agreement will
> replace and supersede any and all previous agreements
> and that it shall be firm on all points herein.

An important aspect to consider is that the Elkouris state: [66] "Arbitrators generally are unwilling to grant to any party by way of a past practice what the party was unable to obtain at the bargaining table." However, undisputed testimony was introduced during the present arbitration hearing that TWU Local 555 President Greg Puriski contacted the following Senior Officers of the Company (Mike Ryan, Vice-President of Ground Operations and Gary Kelly, Chief Executive Officer) about the RONA aircraft cleaning issue and that it was the Union's intent to return to the negotiated language of the CBA.[67] Mr. Puriski further testified that CEO Kelly informed him (Puriski) that the Company would not be able to continue negotiations as long as the 5001/15 grievance was active. Thus, the Union was precluded from negotiating the RONA aircraft cleaning issue during CBA negotiations. The Union explains that following the implementation of the new CBA, the Company made no effort to ether return the work of RONA aircraft cleaning to the Union's work force or to convey to the Union the amount of time required to complete existing arrangements with outside vendors. Thus, the Union filed Grievance 5001/16. In summary, this Arbitrator is convinced that the Zipper clause included in the new CBA eliminates the past practice where the Company utilized non TWU 255 members to perform RONA aircraft cleaning activities.

---

[66] *Elkouri & Elkouri, How Arbitration Works*, 7th Ed., pp. 24-25
[67] At that time, Mr. Puriski was the Lead Negotiator for the Union and Mr. Ryan was the Lead Negotiator for the Company during the most recent CBA negotiations

(c)     *What are the effects of <u>res judicata</u> (the claim preclusion doctrine) for the present grievance (5001/16)?*

The present grievance (5001/16) is not barred by claim preclusion (*res judicata*) because the zipper clause of CBA Article 3 officially nullified and voided any previous agreement (whether the language of the specific article changes or not). The new CBA coupled with the Company's knowledge of an intended return to the clear and unambiguous language of Article Five, Section One of the newly adopted CBA resets the time frames. Finally, the act of performing the covered work in question did not occur until the first day of operating under the newly adopted CBA. In summary, this Arbitrator is convinced that *res judicata* has no effect on the present grievance (5001/16).

*(d) Was the present grievance (5001/16) filed on a timely basis?*

The Union requested that the job duties involved in RONA aircraft cleaning be returned to the Union. When the Company failed to do so, the Union filed Grievance 5001/16. Based on the contractual time frames of the newly implemented CBA, the Union has ten working days to file a grievance. An important question is what is the date when the current CBA became effective and enforceable? The Company's position is that the CBA Ratification date of February 19, 2016 is such a date. However the Union contends that the current CBA became effective and enforceable on March 16, 2016, the date which is shown on the Execution page of the current CBA.[68] By way of explanation, the ratification of a CBA is an internal procedure in which the Union membership reviews the negotiated items within the CBA. Once such ratification is completed,

---

[68] See Page 89 of the current CBA

the Company is so advised and the Parties then agree that both Parties (the Company and the Union) will approve the agreement. The agreement is then signed and dated by officials of both Parties. That signing date becomes the Execution Date and is presented on the Execution Page of the agreement. The Execution Date for the newly negotiated CBA is March 16, 2016 which is listed on page 89 of the present CBA. Grievance 5001/16 was submitted to the Company on March 28, 2016. That March 16, 2016 date is within the ten day required filing date for grievances. In summary, this Arbitrator is convinced that Grievance 5001/16 was filed on a timely basis.

After a careful review of the testimony and evidence presented during the present arbitration hearing and by the Parties' post-hearing briefs, this Arbitrator is convinced that (1) Grievances 5001/15 and 5001/16 are not identical; (2) the Zipper clause included in the new CBA eliminates the past practice where the Company utilized non TWU 255 members to perform RONA aircraft cleaning activities; (3) the concept of *res judicata* (the claim preclusion doctrine) has no effect on Grievance 5001/16 and (4) Grievance 5001/16 has been filed on a timely basis. Accordingly, the present grievance (5001/16) must be sustained.

AWARD

The present grievance (5001/16) is sustained.

College Station, Texas
December 16, 2016

Daniel F. Jennings
Impartial Arbitrator